IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| XPEL, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOPE TINTINGS LLC, <br><br> Defendant. | HONORABLE KAREN M. WILLIAMS <br><br> Civil Action <br> No. 1:**24-7684 KMW/EAP** <br><br> **OPINION** |

**Matthew P. Dolan, Esq.**
MEYNER AND LANDIS LLP
One Gateway Center, Suite 2500
Newark, NJ 07102

*Counsel for Plaintiff XPEL, Inc.*

**WILLIAMS, District Judge:**

**I.   INTRODUCTION**

Plaintiff XPEL, Inc. ("Plaintiff" or "XPEL") brings this action against Dope Tintings LLC ("Defendant" or "Dope Tintings"), asserting claims under federal and state law for trademark infringement and unfair competition. Presently before the Court is Plaintiff's Motion for Default Judgment pursuant to Federal Rule of Civil Procedure 55. For the reasons set forth below, Plaintiff's Motion is denied.

**II.   BACKGROUND**

  **A.   Relevant Facts**

Plaintiff is a Texas-based manufacturer of branded automotive films and coatings. *See* Compl. ¶¶ 1, 8. It is also the owner of several trademarks incorporating its name, which it uses to identify and promote its products and related installation services. *See id.* ¶¶ 11–15, 21–22. Those

trademarks are registered with the U.S. Patent and Trademark Office ("USPTO") and include the following:

(1) Reg. No. 5,855,304 for the word mark "**XPEL**" (for automotive protective films and kits, related installation services, and certain promotional merchandise);

(2) Reg. No. 6,746,523 for the word mark "**XPEL**" (for protective coatings for automotive and marine materials, as well as upholster protectants);

(3) Reg. No. 3,542,360 for the word mark "**XPEL**" (stylized) (for plastic film and kits used to protect automotive paint and glass);

(4) Reg. No. 4,583,615 for the word mark "**XPEL ULTIMATE**" (for plastic film and kits used to protect automotive paint and glass); and

(5) Reg. No. 6,398,052 for the word mark "**XPEL FUSION PLUS**" (for clear ceramic protective coatings for automotive and marine surfaces, as well as upholstery protectants).

(together, the "XPEL Marks"). *See id.*, Exs. A–E.

Plaintiff distributes its trademarked products through a controlled network of authorized independent dealers that operate "in every state in the United States and numerous countries around the world." *Id.* ¶ 18. Those dealers, in turn, market and sell Plaintiff's products and install them on consumer vehicles. *See id.* To become XPEL-authorized, dealers must complete an XPEL training and certification program—a requirement Plaintiff imposes to ensure that the installation of its films comports with "XPEL's quality control standards." *Id.* ¶ 19. In exchange, authorized dealers receive access to Plaintiff's products and permission to promote, sell, and install them using the XPEL Marks. *See id.* ¶¶ 10, 20. Through this network, Plaintiff also extends "a warranty to the purchasers of its films," so long as the films are "installed by an authorized XPEL installer." *Id.* ¶ 10.

Defendant Dope Tintings is an automotive window-tinting shop located in Pennsauken, New Jersey. *See id.* ¶¶ 1, 3. According to the Complaint, Defendant is allegedly promoting, selling, and installing "films" to consumers, and has been doing so while "using the XPEL Marks." *Id.* ¶

23. Defendant, however, "is not an authorized retailer, distributor, dealer, or installer for any goods bearing the XPEL Marks." *Id.* ¶ 24. Nor has Defendant "acquired the goods from XPEL." *Id.* However, because Defendant has not otherwise been given permission to use these marks, Plaintiff refers to Defendant's offerings generally as "Defendant's Unauthorized Products and Services." *Id.* ¶¶ 23–25.

To support those allegations, Plaintiff includes screenshots of promotions on Defendant's website and social-media page that use XPEL-branded terms and product names, including references to "XPEL PRIME" and "XPEL CS & XR." *Id.* at 8–9. One screenshot shows an Instagram post featuring a photo of a vehicle apparently taken in Defendant's shop, with overlay text stating, "We're Installing XPEL ULTIMATE PLUS." *Id.* at 7. Other screenshots advertise pricing, tint-percentage options, and "specials," including an offer for "FREE* XPEL WINDOW TINT." *Id.* at 10. Several of the screenshots include an express disclaimer stating that Dope Tintings is "NOT an authorized XPEL dealer." *Id.* at 8–10. At least one screenshot also advertises a "Lifetime Warranty (Only at Dope Tintings)." *Id.* at 9–10.

Plaintiff further alleges that Defendant has sought to poach or divert customers from XPEL-authorized dealers through a price-undercutting promotion aimed at consumers who had visited an authorized dealer. According to the Complaint, "if any customer brings the business card of one of XPEL's Authorized Dealers to Dope Tintings, Dope Tintings will offer Defendant's Unauthorized Products and Services to that customer at a price that was lower than [] XPEL's Authorized Dealer." *Id.* ¶ 29. The Complaint also includes a screenshot of an Instagram post advertising that promotion with the statement, "We'll Beat ANY South Jersey Xpel Dealer Price!" *Id.* at 10.

According to the Complaint, Defendant's "repeated unauthorized use of the XPEL Marks" was

> intended to cause, has caused, and is likely to continue to cause, consumer confusion, mistake or deception including the misleading of consumers into mistakenly believing that the Defendant's Unauthorized Products and Services are made directly by XPEL, maintained properly and installed pursuant to XPEL's quality control standards or XPEL has authorized, licensed, or sponsored the use by Dope Tintings of the XPEL Marks for those products and services.

*Id.* ¶¶ 26–27, 35.[1] The Complaint concludes that Defendant's "misuse" of these trademarks is "damaging to the reputation and goodwill of XPEL and the XPEL Marks" *Id.* ¶ 36.

### B. Procedural History

Plaintiff filed its Complaint in this action on July 10, 2024, and subsequently served Defendant on July 16, 2024. (ECF Nos. 1, 6.) After Defendant did not timely respond, the Clerk of Court, at Plaintiff's request, entered default against Defendant on August 20, 2024. (ECF No. 12.)

On September 4, 2024, Anthony D. Cox Jr.—an attorney purporting to write on behalf of Defendant—filed a letter, without entering an appearance, advising the Court that Defendant was attempting to retain local counsel to file a responsive pleading. (ECF No. 13.) According to Plaintiff, this individual, a Pennsylvania-based lawyer, was not licensed to practice law in New Jersey, and had in fact been placed on a temporary suspension by the Supreme Court of Pennsylvania's Office of Disciplinary Counsel. (ECF No. 14.)

On September 5, 2024, Plaintiff filed its first Motion for Default Judgment. (ECF No. 15.) Thereafter, on October 1, 2024, an individual identifying himself as Ricardo Ranger—describing himself as Defendant's owner—filed a "Motion to Set Aside/Opposition to Default Judgment"

---

[1] Plaintiff's Motion similarly hypothesizes that Defendant's use of its marks "falsely suggest[s] to customers that its goods were made by, authorized by, or were in any way associated with XPEL." Pl.'s Br. at 1.

seeking to vacate the default and requesting additional time to retain counsel. (ECF No. 17.) Plaintiff opposed this Motion. (ECF No. 18.) Thereafter, the Court entered an Order vacating the Clerk's entry of default and directing Defendant to respond to the Complaint by March 7, 2025. (ECF No. 19.) The Order further advised Mr. Ranger that Defendant is a distinct legal entity who may only appear through licensed counsel. (*Id.*) As such, the Court rejected Mr. Ranger's Motion as an improper submission by a non-attorney and denied Plaintiff's Motion for Default Judgment without prejudice to renewal. (*Id.*) Plaintiff served Defendant with a copy of the Order the next day. (ECF No. 20.) However, Defendant did not file a responsive pleading by the March 7 deadline or otherwise appear through counsel, ultimately leading the Clerk to enter default against it for a second time on March 17, 2025. (ECF No. 21.)

Plaintiff renewed its Motion for Default Judgment on April 24, 2025. (ECF No. 24.) On July 14, 2025, an individual identifying himself as "Rico Ricardo" filed a "Motion to Set Aside Default Judgment," purportedly on Defendant's behalf, notwithstanding that no attorney had entered an appearance for Defendant. (ECF No. 25.) Plaintiff opposed that submission by letter on July 23, 2025. (ECF No. 26.) On August 5, 2025, Ricardo Ranger submitted another letter stating that he had only recently learned that attorney Anthony D. Cox Jr. had been suspended and disbarred. (ECF No. 27.) Ranger asserted that he had believed Cox was handling Defendant's defense, and he indicated that he was seeking new counsel "sympathetic to [his] financial situation" after paying Cox "sizeable amounts." (*Id.*) Plaintiff responded by letter on August 13, 2025. (ECF No. 28.)

To date, no attorney has entered an appearance on Defendant's behalf. Defendant is a limited liability company and therefore may appear in this Court only through licensed counsel. Despite the Court's prior Order advising Defendant of that requirement and affording it an

5

opportunity to respond through counsel, Defendant has filed no proper answer or other responsive pleading. The Clerk of Court has again entered default against Defendant, and Plaintiff's renewed motion for default judgment is now ripe for disposition.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 55 "authorizes courts to enter a default judgment against a properly served defendant who fails to file a timely responsive pleading." *Great Lakes Ins. SE v. Ross*, 652 F. Supp. 3d 472, 476–77 (D.N.J. 2023) (quoting *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535 (D.N.J. 2008)). Rule 55 prescribes a two-step process for obtaining default judgment. First, the moving party must ask the clerk of court to enter default against the silent party. *See* Fed. R. Civ. P. 55(a); *see also Nationwide Mut. Ins. Co. v. Starlight Ballroom Dance Club, Inc.*, 175 F. App'x 519, 521 n.1 (3d Cir. 2006). If and after the clerk enters default, the party may move the court for the entry of default judgment. *See* Fed. R. Civ. P. 55(b)(2). Thereafter, "it is within the discretion of the district court whether to grant a motion for a default judgment." *Dellecese v. Assigned Credit Sols., Inc.*, No. 15-6678, 2017 WL 957848, at *1 (D.N.J. Mar. 10, 2017).

### IV. DISCUSSION

Having previously obtained the entry of default against Defendant by the Clerk of Court, Plaintiff now move for default judgment on the claims Defendant has failed to answer. Notwithstanding the Court's broad discretion under Rule 55(b)(2), default judgment may be entered only if the Court finds (1) that it has subject matter jurisdiction over this action and personal jurisdiction over Defendant; (2) that the unchallenged facts sufficiently establish the elements of the causes of action asserted; and (3) the circumstances otherwise render the entry of

default proper. *See Great Lakes*, 652 F. Supp. 3d at 477; *Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 683 (D.N.J. 2015).

    A.    **<u>Jurisdiction</u>**

Prior to entering default judgment, district courts must confirm that they have jurisdiction over both the subject matter of the dispute and the defaulting party. *See Trustees v. Leo Constructing, LLC*, 718 F. Supp. 3d 436, 441 (D.N.J. 2024); *Chanel, Inc. v. Matos*, 133 F. Supp.3d 678, 683–84 (D.N.J. 2015).

First, the Court finds that it is vested with subject-matter jurisdiction over this action. Subject-matter jurisdiction denotes "the court's authority to hear a given type of case." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (quoting *United States v. Morton*, 467 U.S. 822, 828 (1984). In this case, such authority is established by virtue of the claims Plaintiff asserts under the Lanham Act, which therefore arise under federal law. *See* 28 U.S.C. § 1331 (authorizing exercise of federal-question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"). The Court also properly exercises supplemental jurisdiction over Plaintiff's state-law claims, as they share a "common nucleus of operative fact" with the federal claims. *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *see also* 28 U.S.C. § 1367(a) (authorizing exercise of "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

The Court also finds that it possesses personal jurisdiction over Defendant. Personal jurisdiction refers to the power of the court to issue binding judgments concerning the rights and obligations of parties to a lawsuit. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,

456 U.S. 694, 702 (1982). For federal courts, the "traditional source" of personal jurisdiction lies in Federal Rule of Civil Procedure 4(k)(1)(A). *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 382 (3d Cir. 2022). It provides that service of a summons (or a waiver of service) establishes personal jurisdiction over a defendant when the defendant is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Here, Defendant is "subject to the jurisdiction" of New Jersey courts because it is organized and maintains its principal place of business in the state.[2] *See id.*; *see also Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Bermudez v. Gloucester Eng'g Co. Inc.*, No. 21-cv-13370, 2021 WL 4786147, at *2 (D.N.J. Oct. 14, 2021) (stating that an LLC is deemed "at home" in the state in which "it was organized and where its principal place of business is located"). Moreover, Plaintiff has personally served a copy of the summons on Defendant's registered agent, thereby satisfying Rule 4(k)(1)(A)'s other jurisdictional prerequisite. *See* Fed. R. Civ. P. 4(h)(1)(B) (stating that a business may be served by "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process").

---

[2] For a defendant to be "subject to the jurisdiction" of a state court within the meaning of Rule 4(k)(1)(A), the exercise of personal jurisdiction must both (1) "be authorized by state law" and (2) "comport with the requirements of the Fourteenth Amendment." *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 382–83 (3d Cir. 2022). However, New Jersey law provides for personal jurisdiction coextensive with that allowed by the U.S. Constitution, so the analysis collapses into a Due Process inquiry. *See id.*; *see also FlagHouse, Inc. v. ProSource Dev., Inc.*, 528 F. App'x 186, 188–89 (3d Cir. 2013). The Due Process Clause of the Fourteenth Amendment has been interpreted to require that a defendant have certain "minimum contacts" in the forum state, and that the exercise of jurisdiction comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Those constitutional requirements are satisfied for commercial entities, like Defendant here, who are sued in their home states. *See Daimler*, 571 U.S. at 137 (stating that general personal jurisdiction can be exercised over a corporation where it is "at home," namely its "place of incorporation and principal place of business"). Therefore, the jurisdictional inquiry for in-state defendants under Rule 4(k)(1)(A) is ordinarily satisfied by showing proper service of process. *See, e.g.*, *Chanel*, 133 F. Supp. 3d at 684.

B.   **Sufficiency of Causes of Action**

The Court must next determine whether the unchallenged facts in the Amended Complaint sufficiently establish the elements of the causes of action asserted. *See Great Lakes*, 652 F. Supp. 3d at 477; *Matos*, 133 F. Supp. 3d at 683. While Plaintiff seeks default judgment on all ten claims asserted in the Complaint, the only remedies requested by its Motion are those provided for by the Lanham Act, namely statutory damages, injunctive relief, and attorneys' fees and costs. Because Plaintiff does not seek any relief premised on its other causes of action, the Court confines its merits analysis to Plaintiff's Lanham Act claims.

i.   *Trademark Infringement and Counterfeiting*

The Court first considers Plaintiff's claims for trademark infringement and trademark counterfeiting under § 32 of the Lanham Act.[3] Because both claims arise out of the same statutory provision, and consequently turn on the same core infringement inquiry, the Court addresses them together.

Section 32 of the Lanham Act supplies the statute's core protection for federally registered trademarks by creating a private right of action against unauthorized trademark uses that are likely to confuse consumers. *See* 15 U.S.C. § 1114.[4] To establish a violation, a plaintiff must show that

---

[3] Trademark counterfeiting is generally treated as a species of trademark infringement, albeit a "more serious" one often designed to "trick" consumers into "believing this is the genuine article, rather than a fake." 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:10 (5th ed.). While the elements of counterfeiting largely mirror those for ordinary infringement, though a finding of counterfeiting can serve as a basis for imposing enhanced monetary remedies, including statutory damages. *See* 15 U.S.C. §§ 1116(d)(1)(B)(ii), 1117(c).

[4] Section 32 provides, in relevant part, that a person shall be liable if they—"without the consent of the registrant"—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale,

the defendant (1) used a "reproduction, counterfeit, copy, or colorable imitation" of a registered mark or its packaging; and (2) its use is "likely to cause confusion, or to cause mistake, or to deceive." *Meenaxi Enter., Inc. v. Singh Trading Co.*, No. 23-2288, 2024 WL 3594364, at *3 (3d Cir. July 31, 2024) (quoting 15 U.S.C. § 1114(1)).

The Third Circuit has long held that establishing a § 32 violation requires a trademark owner to show that the products being sold by the alleged infringer are "not genuine," meaning that there are "material differences" between the products sold by the trademark owner and those sold by the alleged infringer. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302–03 (3d Cir. 1998). This requirement reflects the purpose of § 32 to provide relief only to the trademark owner who is "injured by the distribution of *like* goods, which bear facsimile marks, that result in confusion to consumers or detriment to the goodwill developed by the trademark holder in the trademarked goods." *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, 671 (3d Cir. 1989) (emphasis in original). The material-differences test thus asks whether the allegedly infringing products are "likely to injure the goodwill developed by the trademark owner" in its own goods:

> When the products sold by the alleged infringer and the trademark owner contain identical marks but are materially different, consumers are likely to be confused about the quality and nature of the trademarked goods. Characteristics of the alleged infringer's goods that are not shared by the trademark owner's goods are likely to affect consumers' perceptions of the desirability of the owner's goods. Sales of the alleged infringer's goods will tarnish the commercial magnetism of the trademark, injuring the trademark owner. In such circumstances, the alleged infringer's goods are considered "non-genuine" and the sale of the goods constitutes infringement.
>
> In contrast, when the differences between the products prove so minimal that consumers who purchase the alleged infringer's goods get precisely what they believed that they were purchasing, consumers' perceptions of the trademarked goods are not likely to be affected by the alleged infringer's sales. Although consumers may be unaware of the precise avenues that a given product has traveled on its way to the supermarket shelf, the authentic trademark on the alleged

---

distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

15 U.S.C. § 1114(1)(a)–(b).

>  infringer's goods is an accurate indicator of their nature and quality. Thus, the goods may be considered genuine. This does not mean that the trademark owner suffers no economic harm from the alleged infringer's sales, but it does mean that § 32 of the Lanham Act does not offer a remedy to the trademark owner.

*Iberia Foods*, 150 F.3d at 303–04 (citations and quotation marks omitted); *see also Meenaxi*, 2024 WL 3594364, at *3 (applying *Iberia Foods* and *Weil Ceramics*).

Applying those principles here, the Court cannot conclude from the pleaded facts that Defendant's offerings are non-genuine or otherwise materially different from those sold through Plaintiff's authorized network. The screenshots included in the Complaint Defendant show advertising specific XPEL-branded products, including XPEL Ultimate Plus, XPEL Prime CS, and XPEL Prime XR. Plaintiff refers to these offerings generally as "Defendant's Unauthorized Products and Services," alleging only that Defendant is not XPEL-authorized and that it did not "acquire[] the goods from XPEL" (or at least not directly). But Plaintiff does not clearly allege whether Defendant is selling counterfeit products or instead selling authentic XPEL-branded goods outside Plaintiff's authorized channels. Plaintiff gestures toward both possibilities simultaneously without ever committing to either.

On one hand, Plaintiff's foundational are drafted to assume counterfeiting. Throughout the Complaint and its Motion, Plaintiff describes Defendant's offerings as though they are not genuine XPEL-branded products that Plaintiff manufactured, while also alleging that Defendant is intentionally misleading consumers into believing it sells "genuine" XPEL products "made directly by XPEL." Compl. ¶¶ 26–27, 30, 35, 93. At the same time, the Complaint pleads a separate set of facts about training, quality control, and warranty eligibility—facts that would matter only if Defendant is offering authentic XPEL-branded goods and related services outside Plaintiff's authorized network. Plaintiff emphasizes that authorized dealers are trained and certified, must comply with Plaintiff's quality-control standards, and that Plaintiff extends a warranty only when

film is installed by an authorized installer. Building on those allegations, Plaintiff asserts that customers who do business with Defendant receive "products and services bearing XPEL's Marks, but which are not provided by an Authorized Deal[er] and do not come with the XPEL warranty." Compl. ¶ 100. Read naturally, these facts presuppose authenticity of the underlying film and suggest that any asserted "difference" lies not in the film itself, but in quality controls and warranty coverage.

To be sure, in cases involving unauthorized sales of otherwise authentic goods, differences in quality-control measures or warranty protection can, in appropriate circumstances, constitute "material differences" for purposes of a § 32 claim. *See Spectrum Brands, Inc. v. Arrow Merchants LLC*, No. CV 22-992, 2023 WL 6542699, at *4 (D.N.J. Feb. 8, 2023) (collecting cases). The problem here, however, is that Plaintiff has not articulated such a theory. Instead, it strongly signals counterfeiting while pointing to consumer confusion and potential harms that depend on authenticity. By attempting to capture the benefits of both narratives without committing to the factual predicates for either, Plaintiff leaves the Court with no stable factual account on which to evaluate § 32 liability. The Court will not select and develop Plaintiff's position for it. *See Meenaxi*, 2024 WL 3594364, at *3 (affirming denial of default judgment on § 32 claims where plaintiff failed to clearly plead any material differences between owner's goods and allegedly infringing goods).

Even if the Court were to ignore these inconsistencies and assume that Defendant is advertising and installing genuine XPEL film, Plaintiff still has not pleaded facts from which the Court can infer that differences in quality control or warranty coverage render Defendant's offerings materially different from those sold through Plaintiff's authorized network.

First, the invocation of "quality control," standing alone, does not establish a material difference. *See Iberia Foods*, 150 F.3d at 304 (stating that "quality control" is "not a talisman the mere utterance of which entitles the trademark owner to judgment"). To rely on quality-control measures as a relevant difference, the owner must show that the asserted controls are "substantial and nonpretextual," and that the absence of those controls is "likely to result in differences between the products such that consumer confusion regarding the sponsorship of the products could injure the trademark owner's goodwill." *Id.* (citing *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996)). Here, Plaintiff alleges that it trains its authorized dealers to install XPEL-branded films consistent with its "strict quality control standards," and states that Defendant is not so trained. *See* Compl. ¶¶ 10, 19, 24. It also alleges that it expects to have "potential consumers who desire XPEL's high quality films" installed "in accordance with XPEL's quality standards," Compl. ¶ 89. But the Complaint offers no facts describing what Plaintiff's training entails, what those quality-control standards are, or how the absence of such training or controls is likely to result in a materially different or inferior installation. In other words, Plaintiff offers no facts from which the Court could conclude that Defendant's installation practices materially differ in any respect—much less in a way that consumers would find important.

Differences in warranty coverage and service commitments may also be sufficient to maintain a § 32 claim. *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, No. 15-05246, 2019 WL 7288946, at *2 (D.N.J. Dec. 30, 2019) (finding genuine goods were "materially different" because they lacked the "quality, safety, and replacement warranties" that would have accompanied authorized sales); *Spectrum Brands, Inc. v. Arrow Merchants LLC*, No. 22-992, 2023 WL 6542699, at *4 (D.N.J. Feb. 8, 2023) (holding the same where resold goods lacked materials-and-workmanship warranty). Still, the difference must be "material"—that is, "likely to affect

consumers' perceptions of the desirability" of the owner's goods or services in a way that harms goodwill. *Iberia Foods*, 150 F.3d at 303. Here, Plaintiff alleges that customers who hire Defendant to install its films "expect to be able to obtain a warranty." Compl. ¶ 89. But Plaintiff never alleges that customers are at risk of believing they will receive no warranty—only that they would "not [be] able to acquire *XPEL's warranty*." *Id.* ¶ 91 (emphasis added). Yet, the Complaint offers no facts to explain what this warranty covers, when it applies, how consumers expect it, or why they would care about its absence. This gap is even more consequential considering the screenshots Plaintiff provides show Defendant offering some sort of "Lifetime Warranty" of its own, which seems to suggest that consumers are not receiving something meaningfully different in a way that would tarnish Plaintiff's marks.[5]

In short, Plaintiff has not carried its burden to establish § 32 liability. Plaintiff's allegations do not present a consistent factual account of what Defendant is selling, and the Court will not construct a theory of non-genuineness for Plaintiff. Moreover, even crediting the implicit alternative—that Defendant sells authentic films outside authorized channels—Plaintiff's allegations regarding quality control and warranty coverage are too conclusory to show any material difference that stands to harm the XPEL Marks.[6] For these reasons, the Court declines to enter default judgment on Plaintiff's § 32 claims and denies the Motion accordingly.

---

[5] The Court reiterates that Plaintiff has not developed or advanced either theory as a possible basis for finding a material difference. The Court addresses them only arguendo to explain that, even if Plaintiff had clearly pressed them, the Complaint's allegations would still be insufficient under *Iberia*.

[6] In light of the deficiencies discussed herein, the Court declines to devote additional analysis to the separate requirement that Defendant's use of the XPEL Marks is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The Court notes, however, that Plaintiff's allegations on this element fare no better. Plaintiff makes only conclusory assertions of consumer confusion and pleads no well-supported facts from which the Court could conclude that such confusion is likely. Rather, its confusion narrative rests on the same conflicting and undeveloped assertions already discussed above.

### ii. *Plaintiff's Remaining Claims*

Plaintiff also seeks default judgment on its remaining Lanham Act claims for false designation of origin under § 43(a), 15 U.S.C. § 1125(a), and dilution under § 43(c), 15 U.S.C. § 1125(c). The Court declines to enter default judgment on either claim.

As to false designation of origin, the Court sees no reason to conduct a separate merits analysis. Plaintiff's Motion addresses its false-designation claim together with its § 31 infringement claim, and courts often analyze those claims in tandem where, as here, they rest on the same alleged use of the marks and the same asserted confusion. But having already concluded that Plaintiff has not established a viable infringement claim, and because Plaintiff offers no distinct basis for relief, the Court likewise declines to enter default judgment on the false-designation claim.

Plaintiff's dilution claim likewise does not warrant default judgment. Plaintiff proceeds on dilution by blurring, which requires proof that (1) Plaintiff owns a famous mark; (2) Defendant is making commercial use in interstate commerce; (3) Defendant's use began after the mark became famous; and (4) Defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services. 15 U.S.C. § 1125(c). In its Motion, Plaintiff devotes substantial attention to the first three threshold requirements, but reaches the fourth without any well-pleaded fact describing dilution at all. Instead, Plaintiff simply concludes that the fourth element is satisfied because the Complaint asserts that "Defendant's use [of the XPEL Marks] causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services"—a verbatim restatement of the element. This is insufficient. *See Polidoro v. Saluti*, 675 F. App'x 189, 190 (3d Cir. 2017) (instructing that district courts considering default judgment need only accept as true the "well-pleaded factual allegations" of the complaint); *Joe Hand*

15

*Promotions, Inc. v. Forupk LLC*, No. 19-cv-7970, 2020 WL 1864582, at *2 (D.N.J. Apr. 14, 2020) (stating that "a plaintiff seeking default judgment cannot rest on mere conclusory allegations" as to the elements of a claim).

V.  **CONCLUSION**

For the reasons set forth above, the Court denies Plaintiff's Motion for Default Judgment without prejudice. Plaintiff is granted leave to renew its Motion to the extent it wishes to seek relief on any cause of action not addressed in this Opinion. Insofar as Plaintiff wishes to continue pursuing relief under the Lanham Act, Plaintiff is granted leave to file an amended pleading curing the deficiencies identified above, in accordance with the accompanying Order.

Date: December 30, 2025

KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE